E-FILED
Friday, 22 September, 2006  09:27:15 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

```
DOROTHY ROSEBOOM,              )
                               )
        Plaintiff,             )
                               )
    v.                         )   Case No. 05-4053
                               )
JO ANNE B. BARNHART,           )
COMMISSIONER OF SOCIAL         )
SECURITY ADMINISTRATION,       )
                               )
        Defendant.             )
```

## **O R D E R**

Before the Court are Plaintiff's Motion for Summary Judgment or Remand [Doc. # 14] and Defendant's Motion for Summary Affirmance [Doc. # 18]. For the reasons set forth below, Plaintiff's Motion will be granted in part and denied in part.

**I.    Background**

Plaintiff filed applications for Social Security Disability Insurance and Supplemental Security Income (SSI) in June 2001 and July 2001, alleging a disability onset date of June 1, 1993 due to arthritis and impaired vision. (R. at 72-74, 293-297.) Plaintiff was sixty years old on the date she filed her applications. (R. at 72.)

After her applications were denied at the state agency level, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. at 71.) A hearing was held on October 28, 2002, at which Plaintiff (who was represented by counsel) and a vocational expert ("VE") testified. (R. at 305-57.) In a January 16, 2003, decision, the ALJ made the following relevant findings: (1) that Plaintiff was insured for disability benefits through December 31,

2000; (2) that Plaintiff was capable of performing her past relevant work as a real estate sales agent and condominium rental clerk through June 1, 2001, and therefore was not entitled to disability insurance benefits at any time through the date of his decision; and (3) Plaintiff could no longer work as of June 2001, due to the combination of her vision and back impairments, and therefore was eligible for supplemental security income as of that date. (R. at 31-40.) On May 17, 2004, the Social Security Appeals Council denied Plaintiff's request for review. Plaintiff then filed the instant complaint for judicial review of the Social Security Administration's ("SSA's") decision.

The record reveals the following about Plaintiff's visual impairments. June 1992 medical notes from Eye Surgeons Associates indicate that Plaintiff suffered right eye redness which would last for two weeks, clear up, and then recur every one to two months, often in alternate eyes. Her family doctor had prescribed eye drops. The doctor found Plaintiff's visual acuity to be 20/25 in each eye, diagnosed recurrent iritis, and referred Plaintiff to Dr. Robert Phinney for a medical workup to determine the cause of the iritis. (R. at 260.) Follow-up notes indicate "no systemic illness," and that Plaintiff's visual acuity had stabilized, and the doctor directed Plaintiff to taper off her eye drops. (R. at 257-59.) In July 1992, although Plaintiff reported left eye tenderness, the notes indicate her iritis had been resolved. (R. at 254.) In September 1992, Plaintiff returned to Eye Surgeons Associations with complaints of pain and redness in her right eye; she was diagnosed with recurrent iritis. (R. at 251.) In followup

visits in September, October, and November of 1992, Plaintiff reported feeling better and at the last visit the doctor noted that the iritis had resolved. (R. at 246-49.)

In May 1993 on two occasions Plaintiff complained of right eye redness, pain, aching, blurry visions and photophobia. The doctor diagnosed right eye iritis. (R. at 243-44.) Although Plaintiff's iritis episode had resolved in June, in August 1993 she returned again with complaints of right eye redness, aching and photophobia; these symptoms resolved by September. (R. at 242-38.) Plaintiff was again stricken with right eye iritis in December 1993, February 1994, August 1994, and October 1994 which resolved within a few weeks after treatment. (R. at 212-33.) By November 1994, Plaintiff was complaining of symptoms in both eyes and was diagnosed with iritis in both eyes. On November 10, 1994, Plaintiffs visual acuity was reported as 20/40 in her right eye and 20/25 in her left eye. (R. at 211.)

In July 1995, Plaintiff developed an infection after cataract surgery on her right eye, and was treated with intravenous antibiotics and intravitreal antibiotics. (R. at 141-47.) Plaintiff suffered episodes of iritis in August 1995 (right eye), October 1995 (right eye), December 1995 (both eyes), and January 1996 (right eye). A February 7, 1996 report by Dr. Peter Campochiaro at Wilmer Eye Institute indicates Plaintiff's visual acuity with correction was 20/400 in her right eye and 20/30 in her left eye. Dr. Campochiaro attributed the right eye vision loss to optic nerve damage. (R. at 170-72.)

Records from Family Eye Care Associates from December 5, 1995

3

through March 20, 2000 note Plaintiff's history of chronic iritis and continued use of Pred Forte medication. An episode of iritis in May 1997 is also noted. (R. at 282-92.)

Plaintiff was seen at Eye Surgeons Associates on August 23, 2001 and September 4, 2001. A September 7, 2001 report indicates Plaintiff suffered from chronic iritis in both eyes but worse in her left eye, that her corrected visual acuity was 20/400 in her right and 20/60 in her left eye. The report noted a small cataract in the left eye. The doctor noted a flare up of the iritis in the left eye and eye drops were prescribed. The iritis had subsided by September 25 and Plaintiff was told to taper off the eye drops. (R. at 201-09.)

On September 12, 2001, Plaintiff was seen by state agency physician Lawrence H. Hunter. Dr. Hunter noted visual acuity of 20/400 in the right eye and 20/80 (corrected) in the left eye. He noted that Plaintiff's visual acuity in the left eye would fluctuate according to the level of inflamation. Dr. Hunter placed no ocular limitations to work related activities such as sitting, standing, lifting, carrying, handling objects, hearing, or speaking. However, he limited driving to within the city and opined that detail work would be difficult because of poor vision. (R. at 180-81.)

An October 1, 2001 Residual Functional Capacity Assessment indicates Plaintiff was limited in her near and far acuity and field of vision. (R. at 187.)

The record reveals the following about Plaintiff's physical impairments. On August 30, 2001, Plaintiff was examined by Dr. M.

Rajput who noted tenderness over Plaintiff's right sacral joint area with pain radiating from the upper thigh. X-rays showed moderate degenerative arthritic changes involving the lumbar vertebrae. His diagnosis was acute sacroiliatis with possible sciatica. In September 2001, Dr. Rajput noted Plaintiff's arthritis was well controlled with medication, however, he referred her to orthopedics in November for continued pain. (R. at 176-79.)

In February 2002, Plaintiff was seen at John Deere Medical Group by Dr. Marilyn A. Lensing for complaints of sciatic nerve pain. Plaintiff reported that she had "some right buttock and low back discomfort since last summer" including "shooting pain down the right posterior extremity" and mild generalized back pain. She reported that she had been seeing a chiropractor with some help and that she used medication and ice packs as well. Dr. Lensing noted pain with right straight leg raising above 75 degrees in the supine position, diminished reflexes in the lower extremities bilaterally, right thigh atrophy and diffuse right lower extremity weakness. Dr. Lensing further noted that Plaintiff had difficult with toe gait and heel gait on the right lower extremity. (R. at 267.)

From April 5 through August 2, 2002, Plaintiff was seen by Dr. Collins of Orthopaedic & Rheumatology Associates for her back pain complaints. In the initial exam, Dr. Collins noted Plaintiff's history of back pain for about one year with a constant dull ache exacerbated by activities such as walking and standing and alleviated by lying down. Dr. Collins observed that Plaintiff's lumbar range of motion was limited by 25% and tenderness at the right sacroiliac joint, he assessed right sacroiliac joint

dysfunction, and he recommended treatment with medication and physical therapy. (R. at 280-81.) Plaintiff attended physical therapy from June 17 through July 13, 2002 approximately three times per week. (R. at 271-79.) In subsequent visits, Dr. Collins noted some improvement and recommended a home exercise program. (R. at 280-81.)

At the October 28, 2002 administrative hearing, Plaintiff testified to the following. At the time of the hearing, Plaintiff weighed 99 pounds which was 25-30 pounds less than her normal weight. She attributed the weight loss to her eye, hip, and shoulder problems. (R. at 309.) Plaintiff completed high school and was a few credits short of an associates degree. (R. at 310.) Her work history included employment as a bookkeeper for a nursing home through 1993 when she left the job because of her iritis. (R. at 312-14.) She testified that she began part-time work (about 12 hours per week) in real estate in 1994 or 1995. (R. at 314.) She testified that she could not work more hours because of her eye impairments and related doctors appointments. (R. at 315.) In 1999, Plaintiff switched to working at a condo project for a friend, working every other weekend and occasionally during the week hostessing open houses. (R. at 316-17.) Plaintiff left the condo job in about December 2000 to move back to Illinois because she was getting a divorce and she was needed there after her daughter-in-law "got sick"; she has not worked since. (R. at 318.)

Plaintiff testified that her eyes had been problematic for about ten years beginning in the early 1990's. (R. at 323-324.)

She stated that during flare-ups, her left eye is severely affected and both eyes become red, swollen and painful; her vision is diminished and it takes about a month with steroid medication for it to resolve. (R. at 321, 340.) She reported that she has constant irritation and pain that feels like rocks in her eyes and throbbing even when she goes to bed at night and that during flare-ups her sleep is affected. (R. at 321, 340.) She wears prescription glasses most of the time and uses magnifying glasses or a magnifier with a light to read. (R. at 322.) With glasses she can see fairly well at a distance as long as her "eyes are in pretty good shape." She drives very little and does not drive at night or in rain. (R. at 325-26.)

Plaintiff also reported problems with her shoulders, low back, hip, and lower extremities. (R. at 326, 329.) The pain first developed about two to three years prior to the hearing, occurring about two or three times a month, lasting for several days. (R. at 326-28.) She did not seek medical treatment for the pain until she moved to Illinois and saw Dr. Rajput in 2001. (R. at 327.) Plaintiff reported that she has had to hire help for heavy house and yard work since 2000, that she has been unable to walk half a block, that she has been unable to stand for more than 10-15 minutes, that she cannot sit for more than 30 minutes, that she cannot lift ten pounds or bend to pick things up, that she cannot squat, stoop or kneel, that she can seldom use her arms to reach over head, and that pushing and pulling with her arms bothers her. (R. at 334-37.)

Plaintiff testified that in 2000, her daily routine consisted

7

of getting up around 7:30-8:30am, showering, doing dishes, laying down, walking around a little and fixing something to eat. On the days she would go to work she worked from 10am until 6pm. On the days she did not work, she would try to do whatever housework she could do and rest. (R. at 337.) She did not fix big meals because it was too painful for her to stand for prolonged periods of time. (R. at 338.)

Plaintiff testified that she use to be an avid reader but when she tries to read now her eyes start hurting after about 15 minutes and she must rest for an hour or two before she can resume; she stated that she can not read much when her iritis flares up. (R. at 323.) Plaintiff also testified that she gave up her other hobbies of sewing, crocheting, and furniture refinishing when her eye trouble began. (R. at 332.) She also testified that she stopped attending "Eastern Star" meetings in 1998 because there were "a lot of steps and the elevator wasn't working." (R. at 332.)

The record also contains two affidavits from personal associates of Plaintiff. The affidavits are in letter format and generally reiterate the information from Plaintiff's testimony and medical records. (R. at 131-34.)

During the hearing, the ALJ proposed the following hypothetical to the VE:

> I'd like the vocational expert to initially consider the effect it would have on the claimant's ability to perform work if she had essentially no right eye vision, cannot do any detailed work because of her vision loss. Cannot drive as part of a job, did not gave good binocular vision because of her vision loss in the right eye. And the no detailed work covers the reduced vision, somewhat

8

>    reduced vision in the left eye. With those limitations
>    could she have returned to her past work as a bookkeeper
>    or sales agent?

(R. at 352.) The VE answered that the individual would only be able to perform her previous work as a condo sales agent as Plaintiff did it because it would require less visual acuity and no driving. The ALJ then posed the following refinement on the previous hypothetical:

>    considering she was an individual closely approaching
>    advanced age through-let's see, she's been advanced age
>    since 1996 and prior to that was approaching advanced age
>    and has a high school education. Would there have been
>    unskilled work that could have been performed with those
>    limitations?

(R. at 353.) The VE responded that the individual could do jobs as a receptionist, appointment clerk, information clerk, and general clerk/office related jobs. (R. at 354.) The ALJ proposed the following further refinement:

>    if several times a job she would have episodes of acute
>    iritis which for at least one to two months would effect
>    the vision in both eyes severely and cause pain and
>    irritation in the eyes which would severely effect her
>    ability to maintain concentration and attention.

(R. at 354.) The VE opined that the person would generally not be able to continue with performing tasks at the same level that they were performing, to the extent someone else would have to assist, and that would generally not be tolerated for up to one to two months at a time. (R. at 354-55.)

In a January 16, 2003 decision, the ALJ found that Plaintiff had met the disability insured status requirements on June 1, 1993 and continued to meet them through December 31, 2000. He found that Plaintiff had not engaged in substantial gainful activity

since June 1, 1993. (R. at 38.) The ALJ found that Plaintiff had severe impairments including a history of iritis improved with medication, a status post endophthalmitis in the right eye with optic nerve damage in the right eye resulting in 20/400 vision in the right eye, and variable left eye vision from 20/25 to 20/80. He noted that subsequent to June 2001, Plaintiff also had advanced degenerative changes in the spine with complaints of pain. The ALJ found Plaintiffs testimony regarding the intensity and severity of her symptoms not fully credible, and concluded that Plaintiff was disabled after June 1, 2001 but not before that date. (R. at 38.)

## II.  Legal Standard

In order to be entitled to disability insurance benefits, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. See 20 C.F.R. § 404.1505. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. See 20 C.F.R. § 404.1566.

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 1382c (a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. See McNeil v. Califano, 614 F.2d 142, 143 (7th Cir.

1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. § 404.1521,); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. See Garfield v. Schweiker, 732 F.2d 605, 607 n.2 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. See Tom v. Heckler, 779 F.2d 1250, 1253 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. See Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal

standards were applied.  See Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous.  See Imani v. Heckler, 797 F.2d 508, 510 (7th Cir.), cert. denied, 479 U.S. 988 (1986).

### III. Analysis

Plaintiff argues (1) that the ALJ's finding as to Plaintiff's date last insure (DLI) was erroneous; (2) that the ALJ failed to consider all of Plaintiff's eye impairments and lumbosacral impairments in determining that Plaintiff was not disabled prior to June 2001; (3) that the ALJ erred in finding that Plaintiff was capable of performing past relevant work or of using acquired job skills prior to June 1, 2001; and (4) that the ALJ erred in not giving Plaintiff's allegations of disability full credibility.  The Court will address each argument in turn.

**A.  The ALJ did not err in concluding Plaintiff's DLI was December 31, 2000.**

During the administrative hearing, Plaintiff's attorney specifically acknowledged that her DLI was December 31, 2000. Plaintiff now contends that the ALJ should have adopted a DLI of December 31, 2006 which is based on special rules for determining DLI for individuals who meet the criteria for statutory blindness. Under the regulations, a person is statutorily blind if they have central visual acuity of 20/200 or less in the better eye with the

use of correcting lens.  See  20 C.F.R. § 404.1581.

Plaintiff argues that she met the statutory blindness definition because the "functional consequences of her iritis leave her with little or no use of her eyes during episodes of iritis flare-ups."  In particular, Plaintiff points to Dr. Hunter's observation that Plaintiff's visual acuity in the left eye would fluctuate according to the level of inflamation from the iritis, and argues the ALJ had a duty to recontact Dr. Hunter to determine whether Plaintiff's visual acuity in her left eye would qualify her for treatment under the statutory blindness regulations.  However, while the medical records suggest that Plaintiff's left eye vision did fluctuate when her iritis flared up, there is no evidence that the vision in that eye was ever impaired to the degree required under the statutory blindness regulations.  For example, when Plaintiff was seen at Eye Surgeons Associates on August 23, 2001 and September 4, 2001, a doctor noted a flare up of the iritis in the left eye.  At the same time, the doctor reported Plaintiff's visual acuity in the left eye was 20/60. (R. at 201-09.)  Several days later, when Plaintiff was seen by Dr. Hunter, Plaintiff's visual acuity was an even worse 20/80.  (R. at 180.)  However, on November 10, 2001, after the iritis had resolved, the visual acuity in that eye was reported at 20/25.  (R. at 211.)

Plaintiff has cited to no medical report where her visual acuity in the left eye even approached the 20/200 limit for statutory blindness under the regulations.  Further, while Plaintiff testified that some tasks were more difficult for her when her iritis acted up, she did not testify, nor does her

testimony support a conclusion, that she was functionally blind as she now asserts. Thus, the Court finds the ALJ's conclusion regarding Plaintiff's DLI was supported by substantial evidence.

    **B. The ALJ's finding regarding Plaintiff's residual functional capacity prior to June 2001 is supported by substantial evidence.**

The ALJ found that prior to June 2001 Plaintiff retained the following residual functional capacity (RFC):

> to perform the physical exertional and nonexertional requirements of work except that she had no right eye vision so that she should not have been required to perform detailed work. She could occasionally perform work requiring near vision but should not have performed a job requiring constant near vision. Driving was not to be a part of the job. She did not have good binocular vision because of her right eye.

(R. at 37.) Plaintiff argues this RFC is flawed because (1) it fails to account for Plaintiff's lumbosacral spine condition, and (2) it fails to account for the full effects of Plaintiff's eye impairments.

As to Plaintiff's lumbosacral spine condition, Plaintiff acknowledged that she did not seek medical treatment for this problem until August 2001 when Dr. Rajput diagnosed "acute sacroiliatis possible sciatica" and xrays revealed "moderate degenerative arthritic changes involving the lumbar vertebrae." (R. at 177-78.) Further, in September 2001, Dr. Rajput noted Plaintiff's arthritis was well controlled with medication. (R. at 176-79.) Considering the lack of medical treatment for this problem until after June 2001, the Court cannot say that the ALJ's finding that Plaintiff's complaints of disabling pain from this condition prior to June 2001 is clearly erroneous.

Plaintiff also argues that the ALJ failed to consider the limitations caused from the pain associated with Plaintiff's iritis. However, the ALJ discounted Plaintiff's and her friends' testimony as to the frequency of pain associated the iritis, finding that the medical evidence showed when the iritis occurred it responded well to medication and that the medical records did not show persistent treatment after May 1997 for this condition (although Plaintiff was given eye drops to use and she was told not to "overuse them"). Thus, the ALJ did considered Plaintiff's complaints of pain associated with the iritis, but concluded that the iritis episodes did not occur at a disabling frequency prior to June 2001. The Court cannot say this conclusion is clearly erroneous considering the absence of any quantifiable evidence as to the frequency of Plaintiff's iritis episodes after May 1997.

Finally, Plaintiff argues that the ALJ failed to consider that Plaintiff was functionally blind when her iritis flared up. As discussed above, there is no medical evidence to supported this argument, and Plaintiff's own testimony suggests otherwise.

**C.  The ALJ erred in relying on Plaintiff's work experience as a realtor when there is no evidence to suggest Plaintiff's realtor work constituted substantial gainful activity.**

Plaintiff argues that the ALJ erred in considering Plaintiff's past work as a realtor because it was not substantial gainful activity. Defendant has not addressed this argument in their motion. 20 C.F.R. § 404.1565 provides:

> Work experience means skills and abilities you have acquired through work you have done which show the type of work you may be expected to do. Work you have already been able to do shows the kind of work that you may be

15

>expected to do. We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was **substantial gainful activity**.

(emphasis added). Although the ALJ questioned Plaintiff's reporting of her income, he acknowledged in his decision that Plaintiff's realtor work and sales agent work was not substantial gainful activity. (R. at 32.) But, the ALJ mentioned the "sales agent" job as "past work" in his hypothetical to the VE, and the VE's testimony was presumably based on the assumption that Plaintiff's realtor and sales agent work qualified as relevant work experience. All of the jobs listed by the VE are semi-skilled jobs which presumably rely on transferrable job skills. It is not clear from the record whether these transferable skills would be from Plaintiff's previous work as a bookkeeper or as a sales agent. Accordingly, a remand is required to determine if the VE's conclusion would be the same if Plaintiff's realtor and sales agent work is not considered.

>    D.  **The ALJ's findings as to Plaintiff's allegations of disability are not clearly erroneous.**

Plaintiff again argues that the ALJ erred in not giving Plaintiff's testimony regarding her eye pain and symptoms full credibility. As discussed above, in finding Plaintiff's testimony regarding her eye symptoms and pain not entirely credible, the ALJ relied on the evidence showing the iritis responded well to medication, and the lack of evidence as to the frequency of the episodes. Thus, the Court cannot say his credibility findings were clearly erroneous.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment or Remand [Doc. # 14] is GRANTED IN PART and DENIED IN PART and Defendant's Motion for Summary Affirmance [Doc. # 18] is DENIED IN PART and GRANTED IN PART.  This case is remanded, pursuant to the fourth sentence of 42 U.S.C. § 405(g), to the Social Security Administration for further proceedings to consider Plaintiff's disability status in view of the absence of evidence showing that her work as a realtor and sales agent would qualify as substantial gainful activity so as to be relevant as past work.

Entered this <u>22nd</u>  day of September, 2006.

<u>s/ Joe B. McDade</u>
Joe Billy McDade
United States District Judge
